IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.   03-cv-02582-RPM

NICHOLAS SYTSEMA, a minor, by and through his parents,
JACK AND REBECCA SYTSEMA,

        Plaintiff,

v.

ACADEMY SCHOOL DISTRICT NO. 20,

        Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

After exhaustion of the available administrative procedures, Jack and Rebecca Sytsema ("the Sytsemas" or "parents") filed this civil action, claiming that Academy School District No. 20 ("the District") failed to provide their autistic child, Nicholas, a free appropriate public education for the academic years 2001-02 and 2002-03 contrary to the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. § § 1400, *et seq.*, (IDEA) and applicable regulations. Jurisdiction is granted by 20 U.S.C. § 1415(i)(3).  They seek recovery of the costs they incurred in providing appropriate services for their son during those two years.  The administrative record has been submitted and reviewed.  The parties filed briefs and oral argument was heard.

As instructed by the Supreme Court in *Bd. Of Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982) this Court's inquiry is twofold.  First, has the school district complied with the statutory procedures?  Second, "is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"

The evidentiary record was developed in a hearing before an Independent Hearing Officer ("IHO") and in an appeal hearing before an Administrative Law Judge ("ALJ").[1]  In determining whether the administrative record shows that the IDEA requirements have been met, this court must give "due weight" to the hearing officers' findings of fact, considering them to be *prima facie* correct.  *L.B. ex rel K.B. v. Nobo Sch. Dist.,* 379 F.3d 966, 974 (10th Cir. 2004) and the plaintiffs must prove their claims by a preponderance of the evidence on the record submitted.  *Schaffer v. Weast,* ____ U.S. ____, 126 S. Ct. 528, 537 (2005).

There are no material factual disputes requiring credibility findings by the IHO and ALJ.  Accordingly, using modified review, the dispute is determined by assessment of the legal significance of the relevant facts.

 The record shows that Nicholas was born on July 14, 1998.  In January 2001, when Nicholas was approximately 2 ½ years old, he was diagnosed as autistic by Dr. Brian Grabert, a pediatric neurologist.  Autism is a developmental disability characterized by difficulties in social interaction, difficulties in communication, and restricted repetitive and stereotyped patterns of behavior, interest, and activities.  Autism is a spectrum disorder, meaning that the symptoms and characteristics of autism present themselves in a wide variety of combinations.  "The manifestations of autism vary considerably across children and within an individual child over time." (Ex. J-1, National Research Council, EDUCATING CHILDREN WITH AUTISM, at 211 (National Academy Press 2001)).

---

[1]The transcript of the hearing before the IHO consists of four volumes.  References to that transcript are designated by Volume, Page:Lines, *e.g.*, Vol. I, 4:1-2.  The transcript of the hearing before the ALJ is one volume.  References to that transcript are designated as Tr. of ALJ hr'g at page, lines.

The parents contracted with Denver Disability Consultants to oversee a home-based education program for Nicholas, implementing a teaching method known as Applied Behavior Analysis ("ABA").  ABA is one of several teaching methods recognized by experts in the field of autism.  ABA emphasizes one-on-one (1:1) instruction and uses behavioral modification techniques to reinforce desired behavior.  The Sytsemas later contracted with the Autism Partnership to provide the home-based services.

Educational services for disabled children under the age of three are governed by Part C of the IDEA.  *See* 20 U.S.C. §§ 1431 to 1445.  In early February 2001, the Sytsemas contacted Resources for Young Children and Families ("RYCF"), an organization that operates under contract with the District to perform "child find services" and to provide evaluations, eligibility determinations, and administration of services under Part C of the IDEA.  *See* ECEA Reg. 2220-R-401.[2]  An evaluation performed by RYCF showed that Nicholas had significant deficits in physical, social, academic, communication, and self-help skills.  (Ex. B).  A few weeks later, Nicholas was evaluated by the JFK Toddler Study, a privately funded research study conducted through the University of Colorado Health Sciences Center.  (Ex. M).  That evaluation also showed that Nicholas' development was significantly delayed, expressly in the areas of expressive and receptive language.  Based on its evaluation, RYCF provided funding for Nicholas's home-based education program from April 2001 until his third birthday on July 14, 2001.  (Vol. III,

---

[2]Authority for the administration of the IDEA's requirements is shared by federal and state education authorities.  Colorado's rules pertaining to the administration and delivery of educational services to children with disabilities are found at 1 Colo. Code Regs. § 301-8, 2220-R-1.00 *et seq.*  These regulations were enacted pursuant to Colorado's Exceptional Children's Educational Act, C.R.S. § 22-20-101 *et seq.*  ECEA is parallel with the IDEA.  Citations herein are to "ECEA Reg.," and rule number, *e.g.*, 2220-R-1.00.

544:1 – 545:1).  Nicholas was receiving 16 ½ hours of instruction each week in May 2001, and

that number was later increased to 30 hours each week.  RYCF funded 15 hours per week of

home services for Nicholas.

Services for disabled students from ages three to twenty-one are governed by Part B of

the IDEA.  *See* 20 U.S.C. §§ 1411 to 1419.  As Nicholas's third birthday approached, the District

did an evaluation of Nicholas.  (Vol. III, 545:6 – 547:1-8).  The results of this evaluation were

included in a draft IEP presented at a meeting of the District's representatives, the Sytsemas and

Tina Bezdek, one of the specialists treating Nicholas, in May, 2001.[3]  The meeting was held to

prepare an Individualized Education Program ("IEP") for Nicholas.

The requirements for the content and development of an IEP are set forth in § 614(d) of

the IDEA, 20 U.S.C. § 1414(d), in federal regulations promulgated thereunder, and in state

regulations enacted pursuant to the ECEA.  *See* 34 C.F.R. §§ 300.340 through 300.347; ECEA

Reg. 2220-R-402.  An IEP must be developed by an IEP team.  The child's parents are included

as members of the IEP team.  20 U.S.C. § 1414(d)(1)(B).  The "core of the [IDEA] . . . is the

cooperative process it establishes between parents and schools" and "[t]he central vehicle for this

collaboration is the IEP process."  *Schaffer v. Weast*, *supra*.

The District's IEP team at the May meeting consisted of Deb Montgomery (the District's

director of special education), Melinda Graham (the District's autism specialist), a special

education teacher, an occupational therapist, and a social worker.  (Ex. 3, at 2).

Petitioner's Exhibit C and Respondent's Exhibit 3 are copies of the draft IEP prepared by

---

[3]As the IHO opinion notes, the evidence is not clear as to whether this meeting occurred
on May 11, 2001 or May 18, 2001.  The date of the meeting is not relevant to resolution of the
issues before the court.

the District in advance of the May meeting.  It summarized the test results and proposed 10.75

hours of services per week during the 2001-02 school year, of which 9.5 hours per week would

be given in a structured, integrated preschool setting.  An integrated preschool has both disabled

and non-disabled students, and is taught by a special education teacher, assisted by special

education paraprofessionals.  (Vol. I, 67:2-14).  The additional 1.25 hours per week were to be

for speech and language services with an occupational therapist.

      The parents rejected the District's proposal for placement of their son in a preschool

classroom and requested continuation of Nicholas' home-based program of individual instruction.

Deb Montgomery testified that she acknowledged the need for additional services and suggested

six hours per week of individual services, for a total of 15.25 hours of special education and

related services, all to be provided at the school.  That corresponded to the number of hours that

RYCF had been funding in the home.  The Sytsemas did not agree and the meeting ended with the

draft IEP being "tabled."  Ms. Montgomery's suggestion of additional individualized service was

never put in writing and the draft IEP of May 11, 2001, was not changed.

      On July 9, 2001, Jack Sytsema forwarded letters from Susan Stanfield, one of Nicholas's

therapists (Ex. G); Dr. Susan Hepburn, a psychologist with the JFK Center for Developmental

Disabilities (Ex. H); Janet Abrams, another ABA therapist who was then working with Nicholas

(Ex. I), and Dr. Brian Grabert, a neurologist (Ex. J) to the District with a letter identifying the

attached letters as support for the request to continue the ABA home training program for

Nicholas as the appropriate IEP.

      On August 2, 2001, Jack and Rebecca Sytsema met with Ms. Montgomery, the District's

assistant director of special education and a special education teacher.  (Vol. 1, 83:5-24).  This

was an informal meeting because the other members of the District's IEP team did not attend. The Sytsemas again expressed their view that the appropriate educational program for Nicholas would be to continue the ABA home-based instruction. (Vol. I, 83:24 – 85:9). Deb Montgomery testified that she offered to increase the school services to 20 hours per week. Rebecca Sytsema confirmed in her testimony that there was some discussion about increasing the total hours to 20, including 11 hours of one-on-one therapy, to be provided at the school. The Sytsemas continued to oppose placement of Nicholas in the integrated preschool program. No agreement was reached at the meeting and no new meeting was scheduled when it adjourned.

On August 14, 2001, Jack Sytsema sent an email to Ms. Montgomery, inquiring whether a decision had been made regarding their request. (Ex. 9). Ms. Montgomery responded in a letter dated August 17, 2001, referring to a telephone conversation on the previous day, stating that the District was committed to providing special education services to Nicholas in its preschool program. She concluded the letter by saying that the Sytsemas had declined the District's offer of services because they preferred to continue only in-home therapies. (Ex. 10).

Both the IHO and the ALJ concluded that the 2001-2002 IEP was adequate, given the District's offers to provide additional services in the preschool setting. These conclusions are based on an error of law.

The District has a statutory obligation to prepare an IEP as a written statement "of the special education and related services and supplementary aids and services to be provided to the child" and the other elements required by 20 U.S.C. § 1414(d). *Burilovich v. Bd. of Educ. of Lincoln Cons. Schs.*, 208 F.3d 560, 568 (6th Cir. 2000); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001), citing with approval *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526

(9th Cir. 1994).  The Ninth Circuit emphasized the importance of a formal offer of placement to meet the notice requirement of 20 U.S.C. § 1415(b) to form a clear basis for the due process procedures granted to the parents by the Act.

The District failed to comply with the procedural requirement of presenting a final IEP to the parents to accept or reject for the 2001-2002 school year.  The District has not defended the adequacy of the May 11, 2001, draft and it has not challenged the reasonableness of the cost of the privately provided services to Nicholas for that time.  Accordingly, the plaintiffs are entitled to reimbursement of those costs for that year.

In October 2002, the Sytsemas again contacted the District about the possibility of public school services for Nicholas for the 2002-03 school year.  Nicholas was then four years old and had been attending a private integrated preschool three mornings a week, accompanied by a personal aid.  He was also receiving approximately 23 hours of individual home-based instruction.

The District conducted a new evaluation of Nicholas by a team of professionals observing him in his home on October 22, 2002.  In addition, Melinda Graham, the District's autism specialist, evaluated Nicholas on October 29, 2002, using the Mullen Scales of Early Learning. An IEP meeting was held in November 2002.  The Sytsemas attended that meeting.  Deb Montgomery was there on behalf of the District, along with Melinda Graham, and Diane Osaki, a consultant who was working with the District on preschool programming.  Also present were an early childhood special education teacher, a speech/language pathologist, a school social worker, a school nurse, the District's assistant director in charge of preschool programs.  Exhibit 14 is the IEP prepared by the District after that meeting.  It is in compliance with the statutory

requirements. The Sytsemas rejected it and initiated the due process proceedings now under review.

The 2002-03 IEP, dated November 20, 2002, states, "Nicholas will participate in an extended day preschool for 22.5 hours per week, including 5 hours a week of 1:1 discrete trial training. Consultation with occupational therapist. Consultation with autism specialist and district consultants." (Ex. 14 at 8).[4]  The classroom setting proposed by the District for Nicholas was a preschool class of approximately 13 students, including four with special needs. (The addition of Nicholas would have increased the latter number to five.) One teacher and three paraprofessionals were assigned to this class.

At a meeting in November 2002, the Sytsemas agreed that the District's 2002 evaluation of Nicholas was accurate and that goals and objectives identified in the IEP were appropriate. The Sytsemas' failure to consent to the IEP was based on their concerns about the teacher/student ratio, the training of the teachers and the appropriateness of the techniques to be used, given the experience of Nicholas in obtaining benefits from the individual training he had received and the private preschool he attended.

The Sytsemas continued to provide private educational services for Nicholas during the 2002-03 school year. Pages 2 and 3 of Exhibit P summarize actual expenses Sytsemas incurred from July 14, 2002 through December 14, 2002, and estimated expenses from that date through August 31, 2003. There is no dispute that Nicholas obtained an educational benefit from the instruction provided by the Sytsemas for the 2002-03 school year and that the cost of it was

---

[4]As the IHO noted at the hearing, there is discrepancy between the description of total hours described under "Statement of specific services to be provided," and the chart showing how the hours were to be provided. (*See* Vol. I, 97:5 – 98:13).

reasonable.

There was no procedural defect in the preparation of the IEP for the 2002-03 year.  The question is whether that IEP was reasonably calculated to enable Nicholas to receive educational benefits.  The plaintiffs contend that it was deficient because the District failed to recognize the importance of generalization of learning for autistic children.  More particularly, they assert that the plan did not provide for interaction with them, keeping them informed about what was being provided to Nicholas at the school and helping them assist Nicholas in applying the skills he was learning in the home environment.  They also criticize the proposed use of what is described as "errorless training" which uses "prompts" to get appropriate responses from the child because that method had been unsuccessful in the training Nicholas had received.  The Sytsemas were also concerned about the adequacy of this training of the school staff and the lack of research supporting the efficacy of the methodology to be employed.

These same concerns were expressed for the 2001-02 school year and were developed at length in the evidentiary hearings before the IHO and the ALJ.

Melinda Graham, the District's autism specialist, described various methods of instruction recognized by experts in the field of autism, including the LEAP model, the Denver Model, Lovaas, TEACCH, and PECS.[5]  (Vol. I, 203:8 – 206:19).  Those methods are summarized in Exhibit 19.  Ms. Graham characterized the District's program as an "eclectic approach," meaning that the District tries to build an effective program for each autistic student by using strategies

---

[5]LEAP is an acronym for Learning Experiences Alternative Program.  (Ex. J-1, at 143-44).  TEACCH refers to Treatment and Education of Autistic and Related Communication Handicapped Children. (*Id.* at 34).  PECS is an acronym for Picture Exchange Communication System. (*Id.* at 59).  Lovaas also encompasses ABA, discrete trial (DT), and intensive behavior intervention (IBI).  (Ex. 19).

from each of them.  (Vol. I, 207:21 – 208:4).  In 2002 the District began consulting with the

developers of the Denver Model and adopted that approach.  (Vol. II, 226:22 – 227:20), but that

was not a major change in methodology because the Denver Model allowed the District to

continue incorporating multiple teaching strategies.  (Vol. I, 209:5-14).

        Dr. Sue Ann Kline, the executive director of the Autism Asperger Resource Center in

Kansas City, Kansas, testified that an eclectic approach is preferable to the adoption of a single

treatment method.  (Vol. II, 420:2 – 421:10).  The testimony of Dr. Susan Hepburn, an expert

who testified on behalf the Sytsemas at the hearing before the ALJ, shows that flexibility is

advantageous.  Dr. Hepburn stated on direct examination:

> It's really important not to have a one-size-fits-all approach.  Different kids are going to need
> different things.  And then even more critically, those needs are going to change.  If we're
> doing a good job, that child is developing and growing, and we should be changing our
> teaching program all the time.  So it's a very dynamic process.

(Tr. of ALJ Hr'g at 28:10-16).

        Parent counseling and training is one of the "related services" that may be provided in an

IEP.  Parent counseling and training means:  "(i) Assisting parents in understanding the special

needs of their child;  (ii) Providing parents with information about child development; and (iii)

Helping parents to acquire the necessary skills that will allow them to support the implementation

of their child's IEP or [Individualized Family Service Plan]."  34 C.F.R. § 300.24(b)(7).

        Rebecca and Jack Sytsema were very knowledgeable about autism and Nicholas's needs.

The Sytsemas were members of an organization for parents of autistic children.  (Vol. III, 539:8 –

540:24).  They were actively involved in his education.  The written IEP provides for quarterly

progress reports and parent/teacher conferences each semester.  In addition, the testimony of

witnesses for the District shows that the District and its teachers recognize that communication between teachers and parents is an important part of a child's education.  Lori Toma and Jane Leitheiser, the special education preschool teachers for the school where Nicholas would have been assigned, testified about the close relationships and communication they maintain with parents of their autistic students.  (Vol. II, 457:18 – 458:20; Vol. III, 503:11 – 504:8).  Both make home visits.  (Vol. III, 457:17 – 458:10, 525:7-10).  Melinda Graham also testified that she makes home visits. (Vol. II, 317:8 – 318:1).  Ms. Graham also stated that training sessions she conducts for District staff are open to parents.  (Vol. I, 189:15 – 191:13; Vol. II, 317:23-24).  The failure to include any specific description of parent services in the IEP does not make it defective.  These details are not required and there is nothing to suggest that the Sytsemas would not have received the services described by the witnesses as their routine practices.

The Sytsemas contend that IEP proposed for Nicholas was not appropriate because the District's staff lacked the training necessary to meet Nicholas's unique needs.  There is no dispute that the District's special education teachers have Colorado teaching licenses and meet the State's and the District's qualifications for teaching students with special education needs.  Paraprofessional aids do not have the same education and training as teachers, but they work in conjunction with and under the supervision of the special education teachers.

The IHO evaluated the District staff in this language:

> The Respondent [District] has an autism team in place consisting of its autism specialist, a school psychologist, a school social worker, a speech language pathologist, three special education teachers, an occupational therapist.  Its director of special education is knowledgeable and experienced.  The autism specialist, well trained in her field, was knowledgeable about different methodologies and strategies, and her testimony in this proceeding was credible and persuasive.  The special education teachers who would have been [STUDENT'S] primary [*sic* teachers] in the

classroom both testified and were found to be intelligent, enthusiastic, sufficiently experienced and capable.   Adequate supervision, support and training are in place, including that commencing in 2002 from J.F.K. Center for Developmental disabilities. Testimony indicated approximately 30 children being educated in the district with autism equally or more severe than [STUDENT].   The IHO finds Respondent personnel have sufficient skills and resources to enable Respondent to deliver [STUDENT] appropriate services resulting in meaningful educational benefit.

IHO op. at 5, ¶ 15.   Review of the record does not reveal any error in these factual findings or this conclusion.

As set forth above, in 2002 the District began consulting with the developers of the Denver Model and began aligning its methods for teaching autistic students with that model. Exhibit Q is the Denver Model Treatment Manual.   The Manual states, "Currently, interventions through the Denver Model involve three teaching settings:   teaching within daily family routines, daily inclusive group preschool instruction, and 1:1 teaching."   (Ex. Q, at 25, emphasis in original).   The Sytsemas complain that 2002-03 IEP proposed for Nicholas was inappropriate because –   although the District was implementing the Denver Model –   the IEP did not provide a "home component" and did not provide for coordination between the preschool setting and the family.   They contend that without such coordination and without a specific allotment of time for family training and counseling, it was unlikely that Nicholas would be able to "generalize" skills taught in either setting.   "Generalization" of skills refers to the ability to apply a skill learned in one setting to another setting.

Under the section entitled "Early Childhood Special Education and Related Services," the 2002-03 IEP, states that "errorless learning" was one of the instructional activities to be used. The Sytsemas challenge the 2002-03 IEP as inappropriate because of this reference.

Errorless learning is an instructional technique based on behavior modification theory.

With errorless learning, an instructor prompts the student to respond correctly to a question or situation. Rebecca Sytsema testified that errorless learning had been tried and found to be inappropriate for Nicholas because it caused him to become "prompt dependent." In other words, when this technique was used, Nicholas would wait for the instructor to give him the right answer. (Vol. III, 571:5 – 574:7). One of Nicholas's instructors, Janet Abrams Torres, testified that she had tried errorless learning with Nicholas and that it was ineffective and ill-suited for his learning style. (Vol. III, 622:13 – 623:3).

Special education teacher Jane Leitheiser testified that the technique would have been used if it was successful, but not if it wasn't. She also said that she consults with parents about which strategies are effective. (Vol. III, 524:25 – 525:6). Even after its adoption of the Denver Model, the District's methodology was flexible.

The Supreme Court has cautioned that IDEA's provision for administrative review is not "an invitation to the courts to substitute their own notions of sound educational policy for those of school authorities which they review." *Rowley*, 458 U.S. at 206; *see also Logue v. Unified Sch. Dist. No. 512*, Nos. 97-3087, 97-37112, 1998 WL 406787 at * 2 (10th Cir.1998) (When reviewing a decision regarding the IDEA, the court must avoid "the temptation to substitute [its] notion of sound educational policy for that of school authorities."). Furthermore, "parents, no matter how well-motivated, do not have a right . . . to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988). In *Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1038 (8th Cir. 2000), the court observed, "autism experts have a variety of opinions about which type of program is best. Federal courts must defer

-13-

to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible."

The ALJ gave careful attention to the parents' concerns about the adequacy of the services the District would provide for Nicholas and his findings are well within the evidence presented before the IHO and the ALJ.  Giving appropriate deference to those findings this Court cannot say that the District failed to offer an appropriate program for Nicholas for the 2002-03 school year.

During oral argument, the plaintiffs' claim under the § 504 Rehabilitation Act was withdrawn.  The plaintiffs' claims that the defendant violated the Colorado Exceptional Children's Act are duplicative of their claims under the IDEA, and have been resolved by the findings and conclusions set forth above.

Upon the foregoing, it is

ORDERED, that the plaintiffs shall have and recover from the defendant the sum of $38,503.45 to reimburse them for their costs and expenses for the education of Nicholas during the 2001-02 school year and it is

FURTHER ORDERED that the plaintiffs' claim for reimbursement of cost and expenses for the 2002-03 school year is denied.

Counsel for the plaintiffs will submit on or before June 30, 2006, the claim for attorney's fees for this partial recovery in compliance with D.C.COLO.LCivR 54.3.

DATED: June 7th, 2006

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge