IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 03-cv-2582-RPM

NICHOLAS SYTSEMA, a minor, by and through his parents,
JACK AND REBECCA SYTSEMA,

    Plaintiff,

v.

ACADEMY SCHOOL DISTRICT NO. 20,

    Defendant.

## ORDER FOR ENTRY OF JUDGMENT FOR PLAINTIFFS

Plaintiffs Jack and Rebecca Systema brought this suit on behalf of their minor son Nicholas Sytsema, claiming that the Individualized Education Plans ("IEP") developed for Nicholas by Academy School District No. 20 for the 2001-02 and 2002-03 academic years denied Nicholas his right to a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). In the memorandum opinion and order dated June 7, 2006, this court concluded that the written IEP proposed by the District for the 2001-02 academic year was procedurally defective and awarded the Plaintiffs $38,503.45 as reimbursement for the cost of the private education they provided for Nicholas during that school year. The court denied the Plaintiffs' claim for reimbursement of their expenses for the 2002-03 academic year, concluding that the IEP developed by the District for

that year would have provided Nicholas with a FAPE.  Both parties appealed the judgment.  The United States Court of Appeals for the Tenth Circuit reversed the judgment as to the 2001-02 academic year and affirmed as to the 2002-03 academic year.  *Sytsema ex rel. Sytsema v. Academy School District No. 20*, 538 F.3d 1306 (10th Cir. 2008).  The Tenth Circuit remanded with directions to determine whether the 2001-02 IEP complied with the IDEA's substantive requirements, based solely on the written document.

The sole issue to be determined is whether the services described in the written 2001-02 IEP were reasonably calculated to enable Nicholas to receive some educational benefit.  *See Bd. of Education v. Rowley*, 458 U.S. 176 (1982).  "The IEP complies with IDEA's substantive standards if it provides the disabled student with '[a] basic floor of opportunity' . . . [that] consists of access to specialized instruction and related services which are individually designed to provide educational benefit. . . . ." *Sytsema*, 538 F.3d at 1313 (quoting *Rowley*, 458 U.S. at 201).  In its opinion in this case, the Tenth Circuit Court of Appeals explained:

> This court has interpreted the *Rowley* standard to require an educational benefit that is more than *de minimis*. . . . We have also recognized, however, that the Act focuses on providing disabled children access to public schools, and thus, does not require an education "guaranteed to maximize the child's potential." . . . As a result, we apply the "some benefit" standard the Supreme Court adopted in *Rowley*.

538 F.3d at 1313 (citations omitted).

The Sytsemas contend that the IDEA requires the school district to provide a "meaningful benefit" whereby the disabled student achieves "significant learning."  The Tenth Circuit has addressed that argument, noting:

> Admittedly, it is difficult to distinguish between the requirements of the "some benefit" and the "meaningful benefit" standards. We have applied the "some benefit" standard, and thus evaluate the case at bar with that standard in mind.

*Id.* at 1313, n.7.

The role of the District Court in an action under the IDEA is as follows:

> Pursuant to the statute, a district court must independently review the administrative record and apply a preponderance of the evidence standard to decide if the requirements of the IDEA have been met. . . . During its review of the administrative record, the district court must "give "due weight" to the hearing officer's findings of fact, which are considered *prima facie* correct.

*Id.* at 1311 (quoting *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 973-74 (10th Cir.2004)).

This standard has been described as a "modified de novo" review. *See Murray ex rel. Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir.1995).

There have been two administrative hearings in this action, the first conducted by an Impartial Hearing Officer ("IHO") and the second by an Administrative Law Judge ("ALJ"). The IHO and the ALJ did not make any findings as to the educational benefit to be provided by the draft IEP because they considered the IEP to include services that the District offered orally during meetings with the Sytsemas in May and August, 2001. The IHO concluded that the 2001-02 IEP, as modified orally, was appropriately designed to meet Nicholas's needs and was therefore reasonably calculated to confer a meaningful benefit on Nicholas. The ALJ affirmed the IHO's opinion, finding that the District's oral offers were not vague and the Systemas had rejected those offers because the Sytsemas were unwilling to consider any program for Nicholas other than in-home services. Under the statutory structure it would be appropriate to remand this case for another administrative hearing with the findings to be reviewed under the modified de novo standard.

On February 12, 2009, the Sytsemas moved for entry of judgment, arguing that the adequacy of the 2001-02 IEP should be decided by this court without remand to the state administrative process and without consideration of any additional evidence. The District responded with a request to present additional evidence in support of the written draft IEP.

At a hearing held on April 2, 2009, the parties agreed that because of the long delay the adequacy of the IEP should be determined by this court, without further administrative proceedings. The court permitted the submission of additional evidence by affidavits.

It is the Sytsemas' burden to show that the services described in the IEP would not have provided Nicholas with a FAPE. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005)(holding that the party challenging an IEP in a due process hearing bears the burden of proof). The preponderance of the evidence supports their claim. The services described in the written 2001-02 IEP were not appropriate for Nicholas's individual educational needs.

An IEP must contain, in relevant part:

(I) a statement of the child's present levels of academic achievement and functional performance, including –

. . .

    (bb) for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities; . . .

(II) a statement of measurable annual goals, including academic and functional goals . . . ;

(III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided;

(IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . ;

> (V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class . . . ;
>
> . . .
>
> (VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications. . . .

20 U.S.C. § 1414(d)(1)(A).

The IEP for the 2001-02 school year is dated May 11, 2001. (Ex. C.) Nicholas was approximately 34 months old when the IEP was prepared. The evaluation data were taken from a play-based observation of Nicholas conducted by District representatives on May 4, 2001, information from a parent interview and information from Resources for Young Children and Families ("RYCF"). Nicholas was determined to have a disability and to be eligible for special education services. The IEP states that Nicholas had been diagnosed with autism. Developmental delays were identified, particularly in the areas of communication and socialization. Areas of concern were "decreased eye contact, decreased attention to task, decreased receptive/expressive language skills and decreased functional communication." The IEP stated that Nicholas did not follow instructions and expressed himself using sounds and gestures and occasional random words. The accuracy of the evaluation data is not in dispute.

The written IEP includes a statement of goals. The overall goals included development of appropriate classroom behaviors, improvement of functional communication skills, and improvement of self-help skills. Under each of those categories, the IEP listed short-term instructional objectives and benchmarks. Under the heading "Early Childhood Transition Plan," the IEP identified improved communication and socialization skills as the transition priorities and listed activities to address Nicholas's identified language problems and for improving his

motor skills and social interactions. The statement of goals and objectives in the IEP is not a subject of dispute. The dispute between the Sytsemas and the District arose out of disagreement about the appropriate educational setting for Nicholas and whether the District's methods of instruction were adequate for him.

The written IEP stated, "Nicholas will attend an integrated preschool setting with support from Speech/Language. Occupational Therapy will provide consultation on an as-needed basis." An integrated preschool classroom includes disabled and non-disabled students, taught by a special education teacher, assisted by special education para-professionals. The IEP designated 10.75 hours of services per week, with 9.5 hours provided solely by the classroom teacher and para-professionals and 1.25 hours provided by those persons with support from a speech and language specialist. Ten hours (including one hour of speech and language services) were identified as "direct" services and .75 of an hour (including .25 of speech and language) correlated to "indirect" services. Deb Montgomery, the District's Director of Special Education during the relevant time period, testified that direct services are services provided during interaction with the student and indirect services are services that do not involve student interaction, such as consultations among the special education teacher, the speech and language pathologist and the autism specialist. In sum, the written IEP proposed that Nicholas would receive ten hours of instruction in a classroom setting, including one hour of speech and language services. The IEP did not require any individual instruction outside the integrated classroom.

During the administrative proceedings, the Sytsemas' primary claim was that the District violated the IDEA by refusing to fund Nicholas's in-home education, which in May 2001

-6-

consisted of one-on-one instruction using techniques known as Applied Behavior Analysis ("ABA").[1] The Systemas argued that the 2001-02 IEP was deficient in the following ways: (1) the services described in the IEP did not utilize proven methodology; (2) the IEP did not contain sufficient service hours; (3) the IEP did not include necessary services, such as a personal aide, home instruction, and family training and counseling; (4) the proposed preschool setting was not appropriate for Nicholas, and (5) the District staff charged with implementing the services did not have sufficient training or experience to address Nicholas's needs. The Plaintiffs' motion for judgment, dated February 12, 2009, narrows the focus of their challenge. The Sytsemas now argue that the IEP was inadequate because it did not provide enough hours of instruction or any one-on-one instruction outside the classroom.

The number of classroom hours proposed in the written IEP (10 hours per week) represented a significant reduction from the level of instruction (16 ½ hours per week) that Nicholas was receiving in May 2001. Montgomery testified that the ten hours shown on the IEP was based on information the District had received from RYCF, which showed that Nicholas was receiving 10 hours per week of in-home ABA therapy. The RYCF intake form (Exhibit 1) reflects that Nicholas was receiving 10 hours of in-home ABA instruction in February 2001, but that number had increased by May 2001. In May 2001, Nicholas was receiving 16 ½ hours of one-on-one instruction each week. RYCF provided funding for most of that instruction because Nicholas qualified for services under Part C of the IDEA until his third birthday in July 2001.

---

[1] ABA is an instructional method that emphasizes one-on-one instruction and behavioral modification techniques to reinforce desired behavior. *See* Ex. 19 (summarizing methods of instruction recognized by experts in the field of autism) and Ex. J-1, National Research Council, EDUCATING CHILDREN WITH AUTISM, 148-49 (National Academy Press 2001).

The failure to provide any one-on-one services in the IEP and the small number of instructional hours show that the District did not give adequate consideration to Nicholas's individual needs in preparing the IEP. Nicholas was making progress with one-on-one instruction. The change to an integrated classroom setting was a drastic move which required some transitional services to assist him in adjusting to a new environment.

At the hearing before the IHO, the District did not offer any evidence or elicit any testimony regarding the appropriateness of the services described in the written IEP. The District characterized the written IEP as a draft and represented that those services "were never on the table or at issue in this case." (Tr. Vol. II, 396:2-3.) Montgomery testified that the written document "was just kind of a starting point." (Tr. Vol. I, 73:6-11.) Montgomery testified that at the first meeting with the Sytsemas in May 2001, the District recognized the need to increase the hours of instruction and include some one-to-one services. (*Id.* 73:6-13). This evidence shows that the District acknowledged that the services described in the written IEP were not adequate to meet Nicholas's needs.

Even now the District cannot clearly describe the services proposed in the written IEP. The District has submitted an affidavit of Melinda Graham, who was employed as the District's autism specialist during the relevant time period. The District also submitted an affidavit of Deb Montgomery. Graham's affidavit states that the District's IEP team proposed placing Nicholas in a structured preschool program for three half-days per week, because the District recognized that he needed more instruction than a student without special needs, for whom two half-days of preschool per week would be the norm. (Graham aff. ¶ 5.) Montgomery states in her affidavit that the IEP team proposed placing Nicholas in a structured preschool program for four half-days

per week. (Montgomery aff. ¶ 10.) The District's inability to provide a consistent description of the services offered in the 2001-02 IEP underscores that the problems with that document.

Graham's affidavit states, "Participating in Academy 20's structured pre-school program would have provided more than some educational benefit to Nicholas." (Graham aff. ¶ 6.) That statement is a departure from Graham's previous testimony. On cross-examination, Graham explained that she was not opining that the written IEP was appropriate. Graham characterized that document as "unfinished." (Tr. Vol. II, 322:1-6.)

Montgomery states in her affidavit that "the services proposed in Nicholas's IEP were reasonably calculated to enable Nicholas to make some progress towards the goals and objectives contained in his IEP. The services offered would have provided much more than a de minimis educational benefit to Nicholas." (Montgomery aff. ¶ 11.) That opinion is based on Montgomery's current description of the preschool setting as one that would have provided Nicholas with significant individual attention. Montgomery states in her affidavit, "During the entire time [Nicholas] was in school, either an early childhood special education teacher, a para-professional, or a speech language provider would be directly working with Nicholas. Some of this time would be spent doing ABA one-on-one training." (Montgomery aff. ¶ 10.) The written IEP does not support those statements. There is no indication in the written IEP that the classroom instruction or the language services identified in that document would have provided Nicholas with ABA training or constant one-on-one attention. There is no provision in the IEP for an individual aide or teacher for Nicholas.

In response to the Montgomery and Graham affidavits, the Sytsemas submitted the affidavit of Diane Osaki. Osaki is a licensed occupational therapist with expertise in autism.

She testified as a witness for the District during the hearing before the IHO. During cross-examination, the Sytsemas' counsel asked Osaki whether the services described in written 2001-02 IEP would have been appropriate for Nicholas. (Tr. Vol II, 395:14-17.) The District's counsel objected to that question on grounds of relevance and lack of foundation, stating that the document did not represent the offer the District made to the Sytsemas at the May 2001 meeting. Those objections were sustained. (*Id.* 395:18 – 396:17.) Osaki's affidavit states the opinion she would have provided if she had been allowed to answer counsel's question about the written IEP. Osaki opines that the special education services proposed in the written 2001-02 IEP were not appropriate for Nicholas's individual needs. (Osaki aff. ¶ 11.) Osaki states, "The lack of 1:1 systematic instruction leads me to conclude that Nicholas would have likely made little to no progress towards most, if not all, of the goals and objectives set forth in the written IEP." (*Id.* ¶ 12.)

Osaki's opinion carries more weight than the opinions expressed by Graham and Montgomery in their affidavits. During the 2001-02 school year, Osaki worked for JFK Partners and assisted the District with its effort to implement an educational program for children with autism based on the Denver Model.[2] During the administrative proceedings in this action, the District presented Osaki as an expert in education programs for autistic children. The opinion that Osaki expresses in her affidavit is consistent with her testimony about the components of an effective preschool education program for autistic children. Osaki testified that one-on-one

---

[2] The Denver Model is a recognized program for educating children with autism. *See* Exhibit 19; *see also* Exhibit J-1 (the NRC Study) at 80.

instruction is critical for children with autism, in addition to instruction in group situations. (Tr. Vol. II , 364:21 – 365:12.)

The testimony of the Plaintiffs' expert, Dr. Susan Hepburn, supports the conclusion that the 2001-02 IEP was not appropriate for Nicholas. Dr. Hepburn testified that in June 2001, Nicholas still needed a large component of one-on-one instruction. (Tr. Aug. 27, 2003, 39:20 – 40:2.) In a letter dated June 8, 2001, Dr. Hepburn stated that Nicholas lacked the skills to respond to group instruction and needed one-on-one instruction to benefit from instruction in a group setting. (Ex. H.) That assessment, although dated a month after the District's evaluation of Nicholas, is consistent with information that was available to the District when it prepared the written IEP.

Under the IDEA, children with disabilities are to be educated with children who are not disabled, to the maximum extent appropriate. 20 U.S.C. § 1412(5). The term "least restrictive environment" embodies that policy. *Id.*; C.R.S. § 22-20-102(2). "Least restrictive environment" means:

> programs used to educate a child with a disability using the delivery system most appropriately meeting the needs of the child. To the maximum extent appropriate, as determined by the child's IEP team, subject to the appeals procedures outlined in section 22-20-108(3), the term means an environment in which a child with a disability is educated with children without disabilities, unless the nature or severity of the disability is such that education in general education classes with the use of supplementary aids and services cannot be achieved satisfactorily, or, when provided with supplementary aids and services, the nature or severity of the disability is so disruptive that the education of other children in such classes would be significantly impaired.

C.R.S. § 22-20-103(18). In accordance with this definition, the services or combination of services set forth in an IEP must appropriately meet the needs of the disabled child. The goal of educating the disabled child alongside children who are not disabled does not allow a school

district to shortchange the individual needs of the disabled child.

The written 2001-02 IEP did not provide Nicholas a FAPE. The preponderance of the evidence shows that for the 2001-02 school year, Nicholas needed one-on-one instruction for him to obtain more than a de minimis benefit from group participation in a preschool classroom.

Exhibit P summarizes the expenses the Sytsemas incurred from July 14, 2001 through July 13, 2002, for the services of two therapists and two consulting groups. The Plaintiffs are entitled to recover the amounts set forth in Exhibit P that relate to the 2001-02 academic year.

In any action or proceeding brought under 20 U.S.C. § 1415, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(I). The Plaintiffs are the prevailing party with respect to their request for reimbursement for educational expenses for the 2001-02 school year.

Upon the foregoing, it is

ORDERED, judgment will enter for the Plaintiffs in the amount of $38,503.45 to reimburse them for their costs and expenses for the education of Nicholas Sytsema during the 2001-02 school year, and it is

FURTHER ORDERED that the Plaintiffs shall recover their costs upon the filing of a bill

of costs within 10 days after the entry of judgment.  The Plaintiffs shall submit their request for attorneys' fees for this claim in accordance with Fed.R.Civ.P. 54(d)(2) and D.C.COLO.LCivR 54.3.

Dated: October 30, 2009

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge